O'Conley *v.* the President and Selectmen of the City of Natchcz.

NICHOLAS O'CONLEY *vs.* THE PRESIDENT AND SELECTMEN OF
THE CITY OF NATCHEZ.

Smeades
&Marshall
1s    31
94    181

An action for money had and received, will lie against a mere intruder or trespasser, *who has* collected money which belonged to another.

When profits have been received by injuries done to real property, the owner may waive the trespass, and bring his action for money had and received.

The act of 1825, authorizing the city of Natchez to levy a tax or duty on steamboats and other vessels landing at that port, is not repugnant to the 10th section of the 1st article of the Federal Constitution. That act does not profess to divest the right of property in the banks of the river, and is not, therefore, in conflict with the constitution.

The owner of the soil has the right to charge wharfage for the use of a portion of it.

ERROR from the circuit court of Adams county.

Assumpsit brought by Nicholas O'Conley against the President and Selectmen of the City of Natchez, to the October term, 1838. The declaration contained three counts; 1st, a special count, for the use and occupation by the defendants of the plaintiff's wharf and landing, from the 1st of January, 1837, until the 30th of August, 1838, and receiving the rents, issues and profits thereof; the second count is also for use and occupation, and differs from the first only in form; and the third count is for money had and received. The defendants pleaded non-assumpsit; but at a subsequent term, without leave of the court, they filed five special pleas, in substance as follows:

1. That the landing had been held, used, &c., as a public highway, by the city, for three hundred years.

2. That the landing had been set aside and dedicated by the founder of the city, for the use and convenience of said city, and had been so used for three hundred years.

3. That the said landing had been granted by act of congress, of 21st of April, 1806, to the city for public use.

4. That the landing had been used by the public, from time immemorial, as a quay.

5.  That the landing had been set apart and dedicated to the use of the city, as a quay, by the founder thereof.

Neither of these five pleas was disposed of by the court, nor any notice whatever taken of them.   At the May term, 1840, the cause was tried; a verdict returned in favor of the defendants. The plaintiff made a motion for a new trial, which was overruled by the court; and he filed his bill of exceptions, setting out all the evidence adduced on the trial.   By the bill of exceptions, it appears that it was proved by R. L. Smith, that the plaintiff purchased from him, Smith, in 1836, an unexpired term in the landing at Natchez, extending down the river from Porter Street, and took possession thereof; that Smith, from whom he bought, had enjoyed quiet possession of the same, for eight or ten years, had kept it in good repair at considerable expense, and derived an income from steamboats which landed there.

That after O'Conley took possession, he kept it in repair, and received compensation for the use of it from steamboat commanders and others, until the defendants took possession and commenced collecting wharfage; after which it got out of repair. Said landing was not naturally good, but with care and repair, was capable of being made the second best landing in Natchez. While Smith owned it, during about six months of the year, the profits varied from five to fifteen dollars a day; in the summer, the income was much less.   The expense of keeping the landing in repair, was two or three dollars a day.

P. Little proved that he was the owner in fee simple of said landing, from 1820 until this time, and had had peaceable possession all the time until the defendants took possession; that the landing, at first, was forty or fifty feet further out, and had gradually wasted away; that there was no public street at the landing, at that part of the city; that on the 18th of November, 1836, he leased said landing, four hundred feet front, to said O'Conley, which lease is a part of the bill of exceptions, and conveys said lot and landing to the plaintiff for the term of six years, for $250 per annum; that the lot was of little or no value, except for the landing, for which it was very valuable.

James Lynch proved that plaintiff collected wharfage from

steamboats in 1836, from five to fifteen dollars per day; that the income of said landing was worth $300 or $400 per month; that plaintiff made some repairs on the landing, but not much; that the landing was in good repair, and it would cost about $400 a year to keep it in good repair.

John R. Wells proved that he was commissioned harbor-master about the 1st of October, 1837, and was instructed by the defendants to collect tonnage from boatmen according to an ordinance passed 10th March, 1837; that, accordingly, he did collect tonnage from the captains of steamboats, who landed at plaintiff's landing.

The third section of the ordinance provides what "rates shall be paid by the commander, owner or agent, of every sea vessel, steamboat, flatboat, &c. &c., for landing at, and using the harbor;" and that "upon payment of which said charges to the harbor-master, the vessel shall have the use of the landing for four weeks, to discharge her cargo," &c. Said Wells did not keep any account of the amount collected at plaintiff's landing; that the money was mostly expended in improving the landing, on a lot belonging to defendants, above the lot of plaintiff a considerable distance. Plaintiff's landing was in good repair, and the second best in the city; that he thought he had collected $500 at plaintiff's landing for the use thereof; plaintiff's landing was worth $800 a year, clear of all expenses of repairs.

S. B. Withers proved that he was appointed harbor-master in February, 1838, and collected tonnage under instructions from the defendants, according to an ordinance exhibited by the witness, Wells; that plaintiff's landing was out of order, and he never repaired it, but applied the money to repairs of the landing of the defendants.

Christopher Miller proved that he knew the plaintiff's landing fifty years ago; that it was then more than two hundred yards from the river—was unoccupied, and supposed to belong to the government of Spain; that since the change of government, there had been a street in front of said lot, parallel to the river, which had since been washed away—and plaintiff's lot did not extend as far into the river as the place occupied by the said

street; which was all the evidence adduced at the trial. The plaintiff removed the case to this court by writ of error.

*Montgomery* and *Boyd* for plaintiff in error.

The plaintiff, having proved his title to the landing, and quiet and undisputed possession; and that its value was conferred on it by his labor and expense, and of those from whom he derived title; and that he was receiving from those who used it a compensation for such use; and that the defendants took possession and received the profits to a considerable amount, would seem to be entitled to recover, at least, the money which had been received by the defendants, if no more.

It is well settled that the public have no right to use the land of an individual bordering on a water course, although navigable, without making compensation; which, like all other cases, must be regulated either by a contract, or an allowance of the fair value on an implied contract.    See 3 Kent's Com. 425–6.

The principle was settled in England by the decision of the case of *Ball* v. *Herbert*, that at common law, the public had not a right to use the banks of a navigable river, belonging to private persons, for towing, without making compensation; but that such a right might exist by custom.    3 Durnford and East, 260.

In the case now before the court, every pretence of claim by custom is negatived by the testimony in the cause; which fully shows that the plaintiff, and those from whom he derived title, had not been disturbed by such claim on the part of the defendants, for twenty years or more.

What claim, then, can the defendants interpose?

The Act of 1825, page 1, providing for the appointment of a harbor-master, and prescribing his duty, and authorizing the regulation and erection of wharves at the landing, confers no more than an authority to the city to act in the matter in the manner prescribed; but does not give the city the right to the wharfage.    Acts, 1825, page 1.

The supreme court of New York, in construing a similar statute, decide that the corporation cannot make a regulation

reserving the wharfage to themselves, except on the happening of the contingency specified in the statute. 1 Caines' Reports, 547-8.

But the defendants insist that the tolls collected by the harbor-masters, and applied to their use, were collected as tonnage, contrary to, and in violation of the Constitution of the United States; and that neither the plaintiffs nor defendants were legally authorized to collect the same; and, therefore, the plaintiff cannot recover in this action.

If this money had been collected as a fee, or compensation, for the mere privilege of landing goods in the city, we would at once admit it was an unconstitutional exaction, and no action would lie to recover it; but the money is exacted as a compensation for the use of the landing to discharge and take in cargo, &c. See the language of the ordinance in the bill of exceptions. The language of the witness cannot bring the provisions of the constitutional prohibition to the States, " to lay any duty or tonnage," to bear on the case. The language of the ordinance determines the nature of the imposition; not the phraseology of the witnesses. Const. U. S. § 10, Art. 1.

The ordinance of the city was a police regulation, not at all interfering with commerce, and such as the State had a right to adopt; and having conferred the power on the city to make such regulation, it must be considered in the same light as if the State had adopted it.

A law of New York, operating on the rights of individuals to land from foreign ships in that State, was sustained as constitutional, by the supreme court of the United States, on the ground that it was a police regulation. 1 Peters' Digest, 506-7-8. 11 Peters' Rep. 102.

As to what is tonnage, see Ingersoll's Abridgment, 290, § 1. 220, § 69. 221, § 70.

The only remaining point of this case is, whether indebitatus assumpsit for money had and received will lie?

The facts established by the testimony of the wharf-master and others, fully prove that the defendants, by their officers and agents, took possession of the plaintiff's wharf, and continued,

O'Conley *v.* the President and Selectmen of the City of Natchez.

for more than a year, to collect the wharfage of boats using the landing.

The action of assumpsit is an equitable action, applicable to a great variety of cases, in which the plaintiff is clearly entitled to a different remedy. It is by no means necessary, that there should be a contract, as the nature of the action would seem to imply. But it may be maintained in all cases where the law will imply a contract from the circumstances of the case. And it is almost impossible to conceive a case, in which one person has used the property of another to his benefit, in which the law will not imply a contract to make compensation for such use.

Assumpsit for money had and received, has received a more liberal application for the redress of injuries, than any form of action which has been devised. As a general rule, it is said, that whenever one person is in possession of money, which, *ex equo et bono,* belongs to another, this form of action will lie to recover it back. And it has been applied to a great variety of cases in which no money, but merely money's worth, came to the hands of the defendant, which of right belonged to the plaintiff; and this, even in cases where the possession of the defendant was obtained by tort.

Chitty lays down the rule, that it will lie, " though the money have been received tortiously, or by duress of the person or goods;" " the law implying a contract in favor of the party entitled." 1 Chit. Pl. 90. And again, " this count is sustainable in some cases, when money has been received tortiously, without any color of contract." In general, the defendant must actually have received money; though sometimes such receipt will be presumed till the contrary be proved. Ibid, 340. Lord Loughborough, in delivering an opinion in a case where no money had, in fact, been received, uses this peculiar language : " Now when a party has not the substantial justice of the case on his side, the court will not favor any action he may bring. But when justice is clearly with him, they will, if possible, allow him to maintain the action he has brought, because the only effect of a refusal would be, to make him adopt another form of

action." And after considering the whole case, he came to the conclusion that assumpsit for money had and received, would lie when a debt was transferred by the creditor, and the assignment acknowledged by the debtor. 1 Henry Black. Rep. 241.

It appears well settled that this form of action will lie where one person usurps the office of another, and receives the accustomed fees. 1 Bacon, Abr. 260, Asst. A. 2 Modern Rep. 260. 2 Living, 245. Jones, 126-7.

So if one receives my rent, under pretence of title, I may have indebitatus assumpsit against him. 2 Modern, 263. 1 Salk. 28. 2 Dallas, Rep. 176. Cro. Charles, 303, pl. 6.

The case in Cro. Charles shows that an account will lie against one who has received rents due to another; and it is now settled that wherever an account will lie, assumpsit may be maintained. 2 Mod. 263.

If a person pretends to be guardian in socage, and enters into the land of the infant, and takes the profits, an action of account will lie against him. See Holt, arguendo. *Laurins* v. *Dorrill*, 2 Ld. Ray. 1216.

It appears settled that a party injured by a trespass or other tort, may waive it, and bring assumpsit for money had and received, in all cases, where the defendant has converted the property which was the subject of trespass, into money. See Mansfield, arguendo, in *Loudon* v. *Hooper*. Cowper, 419. 2 Durn. and East, 144. 6 Ib. 695.

From these authorities, it is conceived there can be but little doubt the count is properly conceived in this case. The evidence of all the witnesses goes fully to show that the defendants actually received money for the use of the plaintiff's wharf, but leaves it uncertain how much ; under such circumstances, it was for the jury to determine, from all the proof, how much the defendants had probably received.

When the plaintiff has shown so just a right to recover, the court should not turn him round to pursue a different form of action, unless the technical rules of law were so plainly against the form of the count, as to leave no doubt he had misconceived his action.

*Douglas C. Dunlap*, for defendants in error.

The first count is for the recovery of rents, issues, and profits, of plaintiff's wharf, received by defendants. "A wharf is a space of ground artificially prepared for the reception of merchandise from a ship or vessel." Bouvier's Law Dictionary, Vol. 2, page 493. "A wharf is a perpendicular bank or mound of timber or stone and earth, raised on the shore of a harbor, or extending some distance into the water, for the convenience of lading and unlading ships and other vessels." Webster, (title Wharf.)

The plaintiff was not entitled to a verdict under the second count, because an action for use and occupation will not lie, where the possession is adverse, or where the relation of landlord and tenant does not exist. The plaintiff's remedy in this case was trespass or ejectment. This principle is fully established in 1 T. R. 378, 386–7. Lord Raymond, 1216. Bac. Ab. Assumpsit, A. 2 Strange, 1239. 1 Camp. 360. 1 Chitty, Pleadings, 121. 3 Sergeant and Rawle, 501. 10 Mass. Reps. *Cummings et ux.* v. *Noyes*, 435–6. *Wharton* v. *Fitsgerald*, 3 Dallas, 503. *Pott* v. *Lesher*, 1 Yeates, 576. *Featherstonhaugh* v. *Bradshaw*, 1 Wendell, 134. *Bancroft* v. *Wardell*, 13 J. R. 489. *Abeel* v. *Radcliffe*, do. 297. In the case of *Smith* v. *Stewart*, 7 J. R. 46, the court decided that an action for use and occupation could not be supported against a person who entered under a contract to purchase, which he had refused to perform. And in *Vandenheuvel* v. *Stoors*, 3 Conn. 303, where the defendant entered under a contract for the purchase of land and occupied it for several years, and then abandoned it to the plaintiff without performing his contract, it was held that assumpsit for use and occupation could not be maintained, although the defendant was the sole cause why the contract was not carried into effect. It is a principle well settled, as well by American as English adjudication, that an action for use and occupation can only be maintained where the relationship of tenant and landlord is in existence between the parties, and that where the defendant claims under the color of title, ejectment or trespass is the proper remedy. The plaintiff, in this case, introduced no evidence to

the jury to show that the relationship of tenant and landlord existed; but the proof, on the contrary, was, that such a relationship did not exist. The possession of defendants was proven to be adverse; and not the slightest inference can be drawn from the testimony, that the defendants were in possession of the landing in dispute, by an agreement with the plaintiff, either express or implied. The pleadings and the evidence show that the defendants were in quiet and peaceable possession of the landing in dispute, and from that fact, the jury were bound to believe that they were there under a title as of their own right, unless the plaintiff rebutted that presumption by testimony showing that the defendants had entered and occupied the premises as tenants of the plaintiff under an agreement either express or implied. In the absence of such proof, the jury found a verdict for defendants, and in rendering that verdict, they were sanctioned and sustained by the law and the facts.

Again, the jury were right in finding for the defendants, under the first and third counts of plaintiff's declaration, because, in an action for money had and received, the courts will not allow a title to land to be tried. Therefore, rents, issues, and profits, of lands received under an adverse holding or possession, are not recoverable by the rightful owner in this form of action. 1 Leigh's Nisi Prius, 46. The courts will not allow a colorable title to land to be tried under this form of action; but the plaintiff must declare in tort, even though the parties agree to waive the objection to the form of action. 1 Chitty's Pleadings, 386. The same doctrine is also fully sustained in Cowp. 419. 6 T. R. 298. Stra. 915. 2 Henry Blackstone, 408. 9 East. 378, 381. *Jennings* v. *Camp*, 13 J. R. 96. *Clark* v. *Smith*, 14 J. R. 326. 4 Burr, 1985-6. *Baker* v. *Howell*, 6 Serg. and Rawle, 481. *Manypenny* v. *Bristow*, 2 Russ. and Mylne, 117. 2 Sanders, P. and E. 671.

The first count in plaintiff's declaration is a special one, for rents, issues, and profits, of land claimed by the plaintiff as rightful owner; but which is in the legal and quiet possession of the defendants, who hold under adverse title. The third count is for money had and received. The evidence introduced

before the jury, shows no indebtedness between the parties, except what arose from the collection of rents, issues, and profits, of a realty, the title to which was in dispute between the litigants. The defendants were in the quiet and peaceable possession of the land, and that possession was *prima facie* evidence of a title in them, which presumption of title could not be rebutted by the plaintiff in any other manner than by producing and establishing a legal title in himself. This would have presented to the jury for their decision, a direct issue of title—an issue they had no right to try, and which, under the form of action chosen by the plaintiff, they were estopped from adjudicating. The evidence before them proved the defendants in possession of the realty in dispute as of their own right, and not as tenants under the plaintiff; and it mattered not where or in whom the legal title was to be found, so long as the proof showed the defendants to be holders under adverse possession or title. The jury, by their verdict for the defendants, found nothing more nor less than the fact, that the defendants were in possession of the landing in dispute by adverse title or possession, and not as tenants of the plaintiff, and in so finding, they were sanctioned and sustained by the law and the facts.

Again, I contend that the jury were right in finding for the defendants under the first and third counts in plaintiff's declaration, on the ground that no bill of particulars was filed under those counts. The account declared upon is for use and occupation of plaintiff's landing, and not for rents, &c., or money had and received.

But admitting that the declaration as regards the foregoing objections is sufficient, and that the evidence sustains it, yet I contend that the plaintiff was not entitled to a verdict on the merits of the case. The amount claimed by the plaintiff was collected by the defendants as duties and tonnage on vessels, steamboats, &c., navigating the Mississippi river and using the harbor of Natchez, which is admitted to be a port of entry under the laws of the United States. If it was so collected, it was in express violation of the "supreme law of the land." And although the defendants may have enforced payment of the

sums thus collected in derogation of legal right, yet the plaintiff is not the more entitled to the fruits of the defendant's extortion, unless proof should be made to the satisfaction of the jury that the demandant was the lawful recipient of the amounts thus received. The first clause, eighth section, first article of the Constitution of the United States, declares " that congress shall have power to lay and collect taxes, duties, imposts, and excises;" . . . " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." The sixth clause, same article, section ninth, declares " that no preference shall be given by any regulation of commerce or revenue, to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another." The first clause, same article, tenth section, also declares, that " no State shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, . . . . or any duty on tonnage." By these grants from the people, embodied in our constitution, the States have yielded up to the general government full and absolute control over every subject mentioned in the above-cited clauses. In forming that charter of our rights, the people surrendered to federal sway certain powers, and that surrender, unless restricted by positive prohibition and reservation, vested in congress sole and unlimited control over the subjects thus delivered up to their jurisdiction. Some of the powers thus delegated were defined and guarded by reservations for the purpose of protecting the rights and preserving the independence of the different sovereignties, that at that time entered into our national confederacy. But we search in vain for any such reservation in regard to the clauses of the constitution I have cited. No limits are circumscribed; no boundaries set; no orbit delineated. The delegates of the American people, in convention assembled, came forward without a dissenting voice, and threw down upon the altar of their common country, a surrender to the general government of all their rights in regard to commerce, in a national point of view. And an experience of more than half a

century has shown us that the surrender thus made was in accordance with the soundest dictates of political economy, and for the lasting advancement of the common interests of our republic.

The trust thus reposed in the general government was wholly unincumbered, and the broad mantle of federal power and protection was above to cover the vast field of commercial enterprise and intercourse.    Wherever commerce should exist and traffic be carried on, there the constitution was to assert its supremacy, and raise its shield to cherish and sustain; and on that shield alone should be cast the mite destined to nerve the supporting arm and protecting power.    This power thus delegated to the government of the United States, not only embraces commerce throughout all its ramifications, but it also embraces the power to regulate navigation.    *Gibbons* v. *Ogden,* 9 Wheaton, 1. 5 Cond. Rep. 562.    *Brown* v. *State Maryland,* 12 Wheaton, 419.    *Mayor N. Y. City* v. *George Miln,* 11 Peters, 102.

I have looked in vain throughout the whole range of American authorities, for a decision establishing even the right of owners of the soil of the shore of a port of entry to erect wharves and charge *ad libitum* for the use and occupation of such wharves, according to the whims of caprice and avarice.    I believe there are no decisions in point upon that question, and in the absence of such adjudication, we can only look to the constitution of our country, for the powers of individuals and the general government, on this subject.    In pursuing such an inquiry and investigation, common sense and the adoption of judicial rules in analogous cases will meet with application.    What are the powers of the general government under the provisions of the constitution I have cited?    In the adoption of the constitution of our common country, the several States surrendered to the general government sole and unlimited power over this branch of national economy, and that surrender vested in them the exclusive right to govern, regulate and restrain commerce and navigation in all their ramifications throughout the Union, as they should deem proper and expedient.    Of what avail is it to the mercantile adventurer at Pittsburg or Cincinnati, that the con-

stitution of our country guarantees to him the right to navigate the Mississippi, and to dispose of his merchandise wherever he may find a market, and not be obliged to "enter, clear, and pay duties in another port," if he is met at a port of entry declared so by the laws of the United States, and told by an individual who owns the adjacent soil : " *You shall not land here and dispose of your merchandise unless you pay me the sum I demand.*" I do not dispute the right of the owner of the soil, in a port of entry, to demand from the individual who uses the landing of such owner, a compensation for such use and occupation ; but I do contend that no individual who owns the shore of a harbor, that has been declared a port of entry by a law of the United States, has any right to tax a vessel or any vehicle engaged in commerce in any amount, unless such tax is levied and collected under an act of congress.    Where a port of entry is established, all right is taken from the individual who owns the soil to tax those who are engaged in commercial pursuits.    True, it is, that the right to the soil itself remains in the original owner ; but when the United States granted to any individual a tract or portion of land bordering on any navigable stream, or any stream that might thereafter be declared navigable, they reserved the right of declaring any part or portion of said grant a port of entry, and when the United States declared such place a port of entry, all rights that conflicted with the convenience of commerce, in any of its ramifications, were annulled and destroyed. The general government, under the constitution of our country, reserved to itself the power to regulate, govern, and restrain commerce and navigation as it should deem fit and proper. Every grant of land or other demesne made to any individual by and under any act of congress, was made with the reservation that the constitution imposes, and was to be regulated and restricted as the convenience of commerce might require.    The Mississippi, by an act of congress, passed March 1, 1817, section 4, is declared a public highway.    And what is the rule that governs public highways?    The easement is vested in the public—the right to the soil remains in the original owner. Could the owner of the soil through which a public highway

passes, erect a gate and demand toll of travellers without the consent of the legislature? By the constitution, no express power was delegated to the federal government to exercise jurisdiction over public highways, and that power was consequently reserved by the several States as a part and portion of their internal policy. An express grant was made by that instrument to congress, investing in them the supreme and unlimited jurisdiction over commerce; and that investment has been declared, by the highest judicial tribunal of our land, to extend to and embrace navigation throughout all its ramifications—not merely reaching to the jurisdictional lines of a State, but entering into the interior and covering the whole territory of the several States. *Gibbons* v. *Ogden,* 9 Wheaton, 1. 5 Cond. Rep. 270. The right to use the waters of a river declared navigable for the purposes of navigation and commerce, would be perfectly null and nugatory, unless that right also embraced the power to establish ports of entry, and throw open the harbor and shores of such ports for the use and convenience of the public, and the facilities of commercial pursuits.

Such a right would not deprive the owner of soil of his title to the shore or landing, nor his power of controlling the easement subject to the regulations and restrictions that congress might impose for his benefit and the benefit of the public. He has a right to demand of the general government an act authorizing him to erect wharves, and in that act congress has the exclusive privilege of specifying the amount that shall be received by the owner, for the use and occupation of his property. Admit the right to exist in individuals or the States, to tax vessels lading or unlading at a port of entry, without a grant from the general government, and you vest in the owner of the shore the power not only to embarrass commerce, but also the privilege to extirpate and destroy it. If such owner can, as of his own unrestricted right, levy a contribution of one cent, that right must extend to the exaction of any amount that caprice or avarice might dictate, and thereby the powers of the general government would be paralyzed, and a provision of the constitution that was intended to vest in the hands of federal control, su-

preme.and unlimited authority, would be rendered wholly use-
less and inefficient. It is mere sophistry to say that such a
power would never be used by individuals or the State. The
only question to be asked is, Have the constitution and the law
vested it elsewhere? If so, the constitution interposes its su-
premacy, and to that supremacy must bow every doctrine of ex-
pediency and right. The constitution has spoken, and every
doubt that otherwise might have been thrown around the inter-
pretation of its oracles, has vanished at the calm, clear, I had
almost said superhuman exposition of its principles and opera-
tions, by one whose giant mind embraced the whole subject at a
glance, and wrote it, as with a sunbeam, on the tablets of his
country's history.

I do not deem it necessary to argue the question of dedication,
and submit the case to the court upon the points I have laid
before them.

*Jennings,* on the same side.

There is a distinction between the fees of the harbor-master
and wharfage, as there is between a harbor and a wharf. The
act of 1821, Rev. Code, 629–30, authorizes the president and
selectmen to prescribe the fees of the harbor-master. The or-
dinance of 1837 was made pursuant to this authority, and the
fees claimed by O'Conley were collected under this ordinance.
The act of 1825, c. 1, authorizes the city authorities to regu-
late wharfage. But the testimony does not show that O'Conley
had a wharf. The witnesses use the terms "wharf" and "land-
ing" indiscriminately, and as though they regarded them as
synonymous. If O'Conley had a right to charge fees for land-
ing goods on his wharf, (supposing he had one,) under the
name of wharfage or any other name, it is not shown that he
rented the former to the president and selectmen, or that they
ousted him of his *quasi* office.

Per Curiam. This action was brought to recover the amount
of wharfage received by the city authorities, whilst in possession
of plaintiff's wharf, for which he held a lease. Besides a spe-

·cial count, the declaration contains counts for use and occupation, and for money had and received. The jury having found for the defendants, (the president and selectmen,) the plaintiff moved for a new trial, which was overruled, whereupon he set out the evidence and took his bill of exceptions. No question of law having arisen on the trial, we are only called upon to decide upon the propriety of the verdict according to the pleading and evidence.

The plaintiff proved his ownership of the wharf—the collection of wharfage by defendants, and that they derived great profit from it, by tolls or charges, exacted of boats for the use of the landing. Some of the witnesses say that the defendants must have received $800 or $900—others say more. This testimony was sufficient to entitle the plaintiff to a verdict, unless there be some legal impediment to his right of recovery.

For the defendants, it is insisted that the action was not well brought, inasmuch as there was an adverse possession—that the relation of landlord and tenant was not established. On the former argument of the cause, we thought this objection well taken, but a re-argument was granted, and a second examination of the evidence induces the belief that we were mistaken. There was no dispute about the right of soil. The defendants filed several pleas asserting long occupancy, and dedication of the wharf to public uses; but these pleas seem to have been filed at a subsequent term, without leave of court, and were properly disregarded; and there was no proof tending to show any right in them, or any possession, farther than such possession as they might have taken for the purpose of collecting the wharfage under a city regulation. The plaintiff's right was fully established, and there is nothing which shows that he was turned out, or yielded possession of the landing. On this view of the subject, the defendants were mere intruders or trespassers in collecting that which belonged to another. In such cases, the action for money had and received will lie. Even trover or trespass may be waived if the wrong-doer has converted the property into money; and this is the rule also when profits have been received by injuries done to real property. See 4 Phillips's

Evidence (Cowen & Hill's edition,) 220, note 347, and authorities there cited. The special count and the count for use and occupation, without proof to sustain them, cannot deprive the plaintiff of his right to recover under the money count.

But it is also said, in argument, that the wharfage exacted of steamboats and other vessels, was a tonnage duty, and that the act authorizing it, is repugnant to the 10th section of the 1st article of the federal constitution. Tonnage duty, within the meaning of the constitution, is a tax or charge imposed on vessels engaged in importing merchandise into the ports of the United States. It is a commercial regulation exclusively, being a duty on the vessel, levied for the privilege of entering our ports as carriers. The wharfage here claimed is a mere charge made by the owner of the soil for the use of a portion of it, which charge he has a right to make. The price, perhaps, may be subject to municipal regulation, but the right is undoubted. The act of 1825, referred to, does not profess to divest the right of property in the banks of the river, but it merely authorizes the president and selectmen to establish the rates of wharfage, and to collect them through the agency of a harbor-master, and it is therefore not in conflict with the constitution. According to these views, the plaintiff was entitled to recover, and a new trial must be granted.